**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-2166

CAROLINA YOUTH ACTION PROJECT; D.S., by and through her next of kin
Juanita Ford, on behalf of herself and all others similarly situated; S.P., by and
through her next of kin Melissa Downs, on behalf of herself and all others similarly
situated

> Plaintiffs – Appellees,

and

NIYA KENNY, on behalf of herself and all others similarly situated; TAUREAN
NESMITH, on behalf of himself and all others similarly situated

> Plaintiffs,

> v.

ALAN WILSON, in his official capacity as Attorney General of South Carolina

> Defendant – Appellant,

and

J. ALTON CANNON, JR., in his official capacity as the Sheriff of Charleston
County, SC; on behalf of himself and others similarly situated; LUTHER T.
REYNOLDS, in his official capacity as the Chief of the Police Department of the
City of Charleston, SC; REGINALD L. BURGESS, in his official capacity as the
Chief of the Police Department of the City of North Charleston, SC; CARL
RITCHIE, in his official capacity as the Chief of the Police Department of the City
of Mt. Pleasant, SC; on behalf of himself and others similarly situated; LEON
LOTT, in his official capacity as the Sheriff of Richland County, SC; on behalf of
himself and others similarly situated; W. H. HOLBROOK, in his official capacity
as the Chief of the Police Department of the City of Columbia, SC; on behalf of
himself and others similarly situated; JOHNNY MACK BROWN, in his official
capacity as the Interim Sheriff of Greenville County, SC; KEN MILLER, in his
official capacity as the Chief of the Police Department of the City of Greenville,

SC; on behalf of himself and others similarly situated; LANCE CROWE, in his official capacity as the Chief of the Police Department of the City of Travelers Rest, SC; on behalf of himself and others similarly situated; STEVE MOORE, in his official capacity as Interim Chief of the Police Department of the City of Simpsonville, SC; on behalf of himself and others similarly situated; M. BRYAN TURNER, in his official capacity as the Chief of the Police Department of the City of Mauldin, SC; on behalf of himself and others similarly situated; DAN REYNOLDS, in his official capacity as the Chief of the Police Department of the City of Greer, SC; on behalf of himself and others similarly situated; A. KEITH MORTON, in his official capacity as the Chief of the Police Department of the City of Fountain Inn, SC; on behalf of himself and others similarly situated; MICHAEL D. HANSHAW, in his official capacity as Interim Chief of the Police Department of the City of Simpsonville, SC

Defendants.

------------------------------

JUVENILE DEFENDER ADVOCATE; NATIONAL POLICE ACCOUNTABILITY PROJECT; NATIONAL WOMEN'S LAW CENTER, NAACP, NATIONAL DISABILITY RIGHTS NETWORK, NATIONAL CENTER FOR YOUTH LAW, ADVANCEMENT PROJECT NATIONAL OFFICE, ANTI-DEFAMATION LEAGUE, ATLANTA WOMEN FOR EQUALITY, BAZELTON CENTER FOR MENTAL HEALTH LAW, BIRNBAUM WOMEN'S LEADERSHIP NETWORK AT NYU SCHOOL OF LAW, CENTRAL CONFERENCE OF AMERICAN RABBIS, CHICAGO FOUNDATION FOR WOMEN, DISABILITY RIGHTS ADVOCATES, FAMILY EQUALITY, GEORGETOWN LAW - CENTER ON POVERTY AND INEQUALITY'S INITIATIVE ON GENDER JUSTICE & OPPORTUNITY, LAWYERS CLUB OF SAN DIEGO, LEGAL AID AT WORK, MEN OF REFORM JUDAISM, NASW, NATIONAL NETWORK TO END DOMESTIC VIOLENCE, THE WOMENS LAW CENTER OF MARYLAND, INCORPORATED, UNION FOR REFORM JUDAISM, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, WOMEN LAWYERS ON GUARD INC., WOMEN OF REFORM JUDAISM, WOMEN'S BAR ASSOCIATION OF THE DISTRICT OF COLUMBIA, WOMEN'S BAR ASSOCIATION OF THE STATE OF NEW YORK AND WOMEN'S LAW PROJECT

Amici Supporting Appellees.

--------------------

Appeal from the United States District Court for the District of South Carolina, at Charleston. Margaret B. Seymour, Senior District Judge. (2:16-cv-02794-MBS)

Argued: October 25, 2022                  Decided: February 22, 2023

Before NIEMEYER, HARRIS, and HEYTENS, Circuit Judges.

Affirmed by published opinion. Judge Heytens wrote the opinion, in which Judge Harris joined. Judge Niemeyer wrote a dissenting opinion.

**ARGUED:** James Emory Smith, Jr., OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellant. Sarah Hinger, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellees. **ON BRIEF:** Alan Wilson, Attorney General, Robert D. Cook, Solicitor General, Thomas T. Hydrick, Assistant Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellant. Galen Sherwin, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Allen Chaney, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees. Aleksandra Chauhan, Juvenile Defender Advocate, SOUTH CAROLINA COMMISSION ON INDIGENT DEFENSE, Columbia, South Carolina, for Amicus Juvenile Defender Advocate. Lauren Bonds, Eliana Machefsky, Keisha James, NATIONAL POLICE ACCOUNTABILITY PROJECT, New Orleans, Louisiana; Trisha Pande, PATTERSON HARKAVY LLP, Chapel Hill, North Carolina, for Amicus National Police Accountability Project. Sabrina Bernadel, Hunter Iannucci, Sunu Chandy, Emily Martin, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Janette Louard, Victor Goode, Anna Kathryn Barnes, Office of the General Counsel, NAACP, Baltimore, Maryland; Michael Harris, Luke Fernbach, NATIONAL CENTER FOR YOUTH LAW, Oakland, California; Courtney M. Dankworth, Adrian Gonzalez, Dominique Jones, DEBEVOISE & PLIMPTON LLP, New York, New York, for Amici National Women's Law Center, The National Association for the Advancement of Colored People, National Disability Rights Network, National Center for Youth Law, and Additional Advocacy Organizations.

TOBY HEYTENS, Circuit Judge:

South Carolina law makes it a crime for elementary and secondary school students to act "disorderly" or in a "boisterous manner"; use "obscene or profane language"; or "interfere with," "loiter about," or "act in an obnoxious manner" in (or sometimes near) a school. Our primary question is whether the challenged laws give students fair warning about what expressive behaviors may expose them to criminal penalties and contain sufficient guardrails to prevent arbitrary or discriminatory enforcement. Like the district court, we hold the answer is no.

I.

A.

This case involves challenges to two provisions of the South Carolina Code. The first is known as the disorderly conduct law. As relevant here, that law makes it a misdemeanor to "conduct [one]self in a disorderly or boisterous manner" "at any public place" or "use[] obscene or profane language on any highway or at any public place or gathering or in hearing distance of any schoolhouse or church." S.C. Code Ann. § 16-17-530(A)(1) & (2).[1]

The second provision is known as the disturbing schools law. During the relevant time, that provision made it a misdemeanor:

---

[1] The same statute also makes it unlawful to be "found on any highway or at any public place or public gathering in a grossly intoxicated condition" or to "discharge[] any gun, pistol, or other firearm while upon or within fifty yards of any public road or highway" "while under the influence or feigning to be under the influence of intoxicating liquor." S.C. Code Ann. § 16-17-530(A)(1) & (3). Those provisions are not challenged here.

4

> for any person wilfully or unnecessarily (a) to interfere with or to disturb in any way or in any place the students or teachers of any school or college in this State, (b) to loiter about such school or college premises or (c) to act in an obnoxious manner thereon . . . .

S.C. Code § 16-17-420(1) (effective June 2, 2010 to May 16, 2018).[2]

Neither law represents an empty threat. Indeed, the enthusiasm with which one South Carolina school district referred its students for criminal charges prompted the local prosecutor to plead for more disciplinary issues to be resolved internally. The raw numbers tell a similar story. During a 6-year period ending in July 2020, there were 3,735 referrals of people between the ages of 8 and 18 for prosecution under the disorderly conduct law for "school-related" incidents. JA 657. The disturbing schools law was even more widely deployed. During a period of less than 6 years ending in March 2016, more than 9,500 students were referred for prosecution—including children as young as 7 years old.

Not all referrals result in a student being charged or adjudicated delinquent. Referrals generally go first to the South Carolina Department of Juvenile Justice, which makes a recommendation to the local prosecutor's office. If the prosecutor chooses to go

---

[2] In 2018, the disturbing schools law was amended to apply only to non-students. See Act 182, 2018 S.C. Acts (effective date May 17, 2018). This suit was filed before the 2018 amendment, and only the pre-2018 law is at issue in this appeal. For ease of reference, we will refer to the pre-2018 statute as "the disturbing schools law."

No party asserts the post-filing modification to the disturbing schools law creates a mootness problem, and we see none. As explained below, the only relief plaintiffs sought involving that law was an injunction against use of records generated before the 2018 changes. That controversy—which involves future use of existing records—remains very much alive. See Act 182 (providing that "all laws . . . amended by this act must be taken and treated as remaining in full force and effect for . . . the enforcement of . . . duties, penalties, forfeitures, and liabilities as they stood" before the repeal).

forward, the case proceeds in family court. Even when charges are ultimately dismissed, however, they continue to appear on a student's record with the Department of Juvenile Justice and the local prosecutor.

B.

In 2016, four students who had been referred or charged under the disorderly conduct or disturbing schools laws, and a nonprofit organization that advocates for at-risk youth, filed a putative class action challenging both laws as unconstitutionally vague. The district court dismissed the case for lack of standing, but this Court vacated and remanded, holding that at least three of the named plaintiffs adequately alleged a constitutionally sufficient injury in fact. *Kenny v. Wilson*, 885 F.3d 280, 291 (4th Cir. 2018).

On remand, two of the original plaintiffs were voluntarily dismissed and a new plaintiff was added. At this point, the plaintiffs are: (1) two of the people who this Court held adequately alleged injury in fact (S.P. and D.S.); (2) a high school student charged with violating the disturbing schools law for events alleged to have occurred at school when he was in eighth grade (D.D.); and (3) the original organizational plaintiff.

After denying a motion to dismiss, the district court certified one main class and two subclasses under Federal Rule of Civil Procedure 23(b)(2). The main class is represented by the individual plaintiffs (S.P., D.S., and D.D.) and includes:

> All elementary and secondary school students in South Carolina, each of whom faces a risk of . . . arrest or juvenile referral under the broad and overly vague terms of [the disorderly conduct law] while attending school.

JA 274–75. The first subclass consists of:

> All elementary and secondary school students in South Carolina for whom a record exists relating to being taken into custody, charges filed, adjudication, or disposition under [the disorderly conduct law].

JA 275. And the second subclass includes:

> All elementary and secondary school students in South Carolina for whom a record exists relating to being taken into custody, charges filed, adjudication, or disposition under [the disturbing schools law] prior to May 17, 2018.

*Id.*

The district court later granted summary judgment for the plaintiffs. The court held that both laws were unconstitutionally vague as applied to elementary and secondary school students, and it permanently enjoined future enforcement of the disorderly conduct law against those students.[3] The district court also "permanently enjoined" the defendants "from retaining the records of the" members of each subclass "relating to being taken into custody, charges filed, adjudication, or disposition" under either the disorderly conduct or disturbing schools laws, "except as would be permissible following expungement under S.C. Code Ann. § 17-1-40." JA 947.

One of the named defendants—South Carolina's Attorney General—appeals, lodging multiple challenges to the district court's rulings. We review the district court's decision to certify a class for abuse of discretion, its grant of summary judgment de novo, and its decision to order injunctive relief for abuse of discretion. See *Berry v. Schulman*,

---

[3] Plaintiffs did not seek an injunction against future enforcement of the disturbing schools law, which had been amended to apply only to non-students by the time of the district court's judgment. See note 2, *supra*.

807 F.3d 600, 608 (4th Cir. 2015) (class certification); *Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020) (summary judgment); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (injunctive relief).

## II.

We begin by explaining why plaintiffs have standing and why we reject the Attorney General's efforts to import standing concepts into the class certification analysis.

## A.

No lawsuit may proceed in federal court unless the party seeking relief has Article III standing. Because "standing is not dispensed in gross," "a plaintiff must demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quotation marks omitted).

Article III standing has three elements. The plaintiff must have "suffered an injury in fact that is concrete, particularized, and actual or imminent." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020). The plaintiff's injury must have been "caused by the defendant." *Id.* And it must be "likely" the plaintiff's injury will "be redressed by the requested judicial relief." *Id.*

We conclude two of the named plaintiffs—S.P. and D.D.—between them have standing to seek each form of relief requested in the current complaint and granted by the district court. Accordingly, we need not consider whether the other plaintiffs have standing or if their claims are otherwise justiciable. See *Town of Chester*, 137 S. Ct. at 1650 (stating that where "there are multiple plaintiffs," "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint"); *Rumsfeld v. Forum for Acad. & Inst.*

*Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) (unnecessary to consider other plaintiffs once one plaintiff has established standing to bring a particular claim).[4]

During an earlier appeal, this Court held S.P. made "allegations . . . sufficient to establish an injury in fact." *Kenny*, 885 F.3d at 291. Indeed, the Court determined S.P. satisfied that requirement in two ways. First, S.P. had "a sufficiently imminent [future] injury" by alleging she faced "a credible threat of prosecution" for conduct that "is inevitable on school grounds." *Id.* at 288–89, 291 (quotation marks omitted). Second, S.P. had "an ongoing [present] injury" because she "plausibly allege[d]" the disorderly conduct and disturbing schools laws "have a chilling effect on [her] free expression." *Id.* at 288, 289 n.3.

D.D. was not yet a plaintiff during the previous appeal. But we do not perceive—and the Attorney General does not identify—any relevant difference between S.P.'s and

---

[4] The Attorney General does not assert Article III requires that a single plaintiff have standing to seek every form of relief sought in the complaint, and we see no warrant for imposing such a requirement. Any such view would sit uncomfortably with *Town of Chester*, which states that "[i]f different parties raising a single issue seek different relief, then standing must be shown for each [form of relief]." 137 S. Ct. at 1651 n.3. Nor are we aware of any authority for the proposition that Article III requires a single "master plaintiff" with standing to seek every form of requested relief rather than at least *one* plaintiff with standing to seek *each* form of relief. Cf. *J.D. v. Azar*, 925 F.3d 1291, 1324 (D.C. Cir. 2019) ("The irreducible constitutional minimum of Article III . . . is [a]t least one plaintiff—and *only* one plaintiff—with standing to seek each form of relief requested in the complaint." (quotation marks and citations omitted)); *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124 (11th Cir. 2019) ("[O]nly one named plaintiff for each proposed class needs to have standing for a particular claim to advance."); *Brackeen v. Haaland*, 994 F.3d 249, 291 (5th Cir. 2021) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement, and we therefore need conclude only that one plaintiff in the present case satisfies standing with respect to each claim." (quotation marks omitted)), cert. granted sub nom. *Nation v. Brackeen*, 142 S. Ct. 1204 (2022).

D.D.'s allegations supporting standing. Nor does the Attorney General assert that S.P. and D.D. failed to back up their allegations "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

The second and third standing requirements—causation and redressability—are also satisfied. The threat of future prosecution, the present chill of constitutionally protected expression, and the lingering effects of having been referred or charged (S.P. under the disorderly conduct law and D.D. under the disturbing schools law) are directly caused by the challenged laws. In addition, each of those harms is likely to be lessened by injunctions barring the future enforcement of the disorderly conduct law against students and prohibiting government officials from making further use of past referrals or charges.

B.

The Attorney General does not directly assert plaintiffs lack standing. At the same time, many of the Attorney General's arguments about why the district court abused its discretion in certifying the three classes represent efforts to import justiciability concepts into the class certification analysis.

For example, the Attorney General insists that "[t]he vast majority" of South Carolina's nearly 800,000 elementary and secondary school students "never have been charged under either" the disorderly conduct or disturbing schools laws, "nor will they be concerned that they might be charged in the future." A.G. Br. 50. The Attorney General also suggests "many students . . . may prefer that the laws be enforced." *Id.* at 49.

To be sure, if the class representatives fell within the purported "majority" the Attorney General describes, there would be no justiciable case or controversy. People without their own government records lack standing to ask that other people's records not be used. See *Kenny*, 885 F.3d at 287 n.2 ("one plaintiff does not have standing to request that another plaintiff's records be expunged"). Even those who have suffered a past harm— including a referral or charge—cannot seek injunctive relief against future referrals or charges unless a recurrence is likely. See, *e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–10 (1983). And at least at some point, lack of disagreement between the parties about what should happen in the real world would prevent "sufficient concrete adversity . . . to satisfy Article III." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987).

But none of that has anything to do with class certification. "Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court [and] there is no further, separate 'class action standing' requirement." 1 Newberg and Rubenstein on Class Actions § 2:1 (6th ed. 2022). Put another way, "[i]f a class representative has standing" to seek equitable relief, "the case is justiciable and the proponent of the class suit need not demonstrate that each class member has standing" to obtain class certification. § 2.3 & n.15 (citing cases); accord *Hyland v. Navient Corp.*, 48 F.4th 110, 118 & n.1 (2d Cir. 2022); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022) (en banc). As we have already explained, at least one class representative for the main class and both subclasses has Article III standing to seek each form of equitable relief requested in the complaint. Nothing more is required on that score.

We also are unpersuaded by the Attorney General's arguments that the main class and two subclasses certified by the district court fail the commonality, adequacy, and typicality requirements imposed by Federal Rule of Civil Procedure 23. This Court's "review of class certification issues is deferential, cognizant of both the considerable advantages that our district court colleagues possess in managing complex litigation and the need to afford them some latitude in bringing that expertise to bear." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019).

Commonality requires an entire set of claims "depend upon a common contention" that is "capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). That standard is satisfied here. The common contention among members of the main class is that the disorderly conduct law is unconstitutionally vague because it fails to provide fair notice about what conduct is prohibited and invites discriminatory enforcement. That contention is "capable of classwide resolution" because the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the" class members' "claims in one stroke." *Id.*

Each of the subclasses likewise shares a question. By their terms, the subclasses are limited to "elementary and secondary school students in South Carolina for whom a record exists relating to being taken into custody, charges filed, adjudication, or disposition" under the disorderly conduct law or the disturbing schools law. JA 275. The subclasses' members thus share the "same injury"—that is, the harms flowing from the existence of such records. *Wal-Mart*, 564 U.S. at 350 (quotation marks omitted). What is more, a class action has potential to generate "common *answers*"—including the permissibility of the type of

injunctive relief sought by the plaintiffs and awarded by the district court. *Id.* (quotation marks omitted).

The Attorney General also insists the class representatives' claims are atypical because each of the class representatives has been referred under or charged with violating the disorderly conduct or disturbing schools law, even though the vast majority of class members have never been charged under either statute. But the main class brings a pre-enforcement challenge against *future* uses of the disorderly conduct law, and the class representatives' past charges do not bear on their typical experiences as students threatened by future prosecution. The class representatives' claims are especially typical of members of the subclasses, whose members were all arrested, charged, or adjudicated under one of the laws at issue.

The Attorney General fares no better in his passing suggestion that "the disparity in the status of the individual Plaintiffs and most all of the class members prevents them from 'adequately protect[ing] the interests of the class.'" A.G. Br. 51 (quoting Fed. R. Civ. P. 23(a)(4)). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The Attorney General identifies no such conflicts of interest. If anything, the class representatives' experiences with being charged under the challenged statutes enhance their incentive to vigorously prosecute the class's shared claim that the disorderly conduct law cannot be fairly enforced against students. The Attorney General points to no authority—nor do we see any rationale—for decertifying a class because its representatives are *more* highly motivated than unnamed class members to

13

advance their shared interests. We thus hold that the district court did not abuse its discretion in certifying the main class and its two subclasses.

III.

Like the district court, we hold that both the disorderly conduct and disturbing schools laws are unconstitutionally vague as applied to elementary and secondary school students. See note 1, *supra* (identifying portions of the disorderly conduct law not challenged in this litigation).

A.

The Fourteenth Amendment declares: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. One component of due process is the void-for-vagueness doctrine. That doctrine bars a State from taking away life, liberty, or property under a law that fails to "give a person of ordinary intelligence adequate notice of what conduct is prohibited" or lacks "sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc).

Of course, nearly every law entails some ambiguity, and "[t]he degree of vagueness tolerated . . . depends in part on the type of statute." *Manning*, 930 F.3d at 272. Because "the 'consequences of imprecision are qualitatively less severe,'" "[l]ess clarity is required in purely civil statutes." *Id.* (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). In contrast, laws imposing "criminal penalties" or "threaten[ing] to inhibit the exercise of constitutionally protected rights" are subject to "a stricter standard." *Hoffman Estates*, 455 U.S. at 499; *Manning*, 930 F.3d at 272. The "test

14

of vagueness applies with particular force in review of laws dealing with speech." *Hynes v. Mayor & Council of Oradell*, 425 U.S. 610, 620 (1976); accord *Edgar v. Haines*, 2 F.4th 298, 316 (4th Cir. 2021) (explaining the "twin concerns of inadequate notice and arbitrary or discriminatory enforcement are especially pronounced when a regulation implicates speech" (quotation marks omitted)).

The Attorney General offers three arguments for applying a more lenient vagueness test here. We find each unpersuasive.

Citing *Hoffman Estates* and this Court's decision in *Martin v. Lloyd*, 700 F.3d 132 (4th Cir. 2012), the Attorney General asserts the challenged laws do not implicate "a substantial amount of constitutionally protected conduct" and thus may not be declared void for vagueness unless they are "impermissibly vague in all [their] applications." A.G. Br. 20 (quoting *Martin*, 700 F.3d at 135). That argument misreads *Martin*, *Hoffman Estates*, and the decisions since them. *Martin* emphasized that where a challenged statute "imposes criminal penalties"—as these statutes do—"the standard of certainty is higher and the statute can be invalidated on its face even where it could conceivably have . . . some valid application." 700 F.3d at 135 (quotation marks omitted). *Hoffman Estates* said the "all of its applications" standard is limited to situations in which the challenged law implicates "*no* constitutionally protected conduct" and it specifically distinguished "[v]agueness challenges to statutes" that "involve First Amendment freedoms." 455 U.S. at 495 & n.7 (emphasis added). Finally, the Supreme Court has now twice clarified that "although statements in some of [its] opinions could be read to suggest otherwise," the Court's "*holdings* squarely contradict the theory that a vague provision is constitutional

merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2015); accord *Sessions v. Dimaya*, 138 S. Ct. 1204, 1214 n.3 (2018).

Shifting gears, the Attorney General suggests the challenged laws do not implicate *any* constitutionally protected conduct and more leeway is thus appropriate. This Court already rejected the first step of that argument in our previous opinion in this very case. In *Kenny*, this Court identified two bases for concluding the individual plaintiffs had alleged a constitutionally sufficient injury, both of which turned on the notion that the challenged statutes implicate "First Amendment rights" and "have a chilling effect on . . . free expression." *Kenny*, 885 F.3d at 289 n.3; see *id.* at 289–90. That conclusion was necessary to the Court's holding in *Kenny*, and we see no warrant to depart from it here.[5]

Finally, the Attorney General argues that plaintiffs' attacks on both the disorderly conduct and disturbing schools laws should be viewed as facial challenges and the district court failed to treat those challenges with appropriate "disfavor." A.G. Br. 19. We acknowledge the persistent and muddy dispute about whether plaintiffs' challenges are properly described as facial, as applied, or both. In particular, the dichotomy between facial and as-applied challenges does not map neatly onto plaintiffs' claim that the disorderly

---

[5] That these statutes implicate First Amendment protected conduct undermines the Attorney General's reliance on *Copeland v. Vance*, 893 F.3d 101 (2d Cir. 2018), which rejected a vagueness challenge to a New York law criminalizing possession of certain knives. As *Copeland* acknowledged, the "general principles" it applied "are more flexible in vagueness cases involving the First Amendment." *Id.* at 111 n.2.

conduct law is vague on its face when applied to the thousands of elementary and secondary school students throughout South Carolina.

In the end, we conclude this quarrel is much ado about little. Beyond insisting that facial challenges are "looked upon with disfavor" and that this fact represents "a further constraint" on a court's ability to find the challenged statutes facially unconstitutional, A.G. Br. 18, the Attorney General does not contend that the answer to the facial versus as-applied question changes the basic legal standard governing plaintiffs' vagueness challenge. Instead, the classification dictates the amount of caution with which we proceed and how much we consider plaintiffs' particular identity and circumstances. See *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 204 (4th Cir. 2022). Mindful of both judicial restraint and the unique circumstances of students in a school setting, we proceed.

## B.

We begin with the disorderly conduct law, which, as relevant here, makes it a crime to conduct oneself in a "disorderly" or "boisterous" manner or use "obscene" or "profane" language within earshot of a school. S.C. Code Ann. § 16-17-530(A)(1)–(2).

### 1.

For those who have met—or been—elementary or secondary school students, a question naturally arises: How does this statute objectively distinguish *criminally* disorderly, boisterous, obscene, or profane childhood misbehavior from *garden-variety* disorderly, boisterous, obscene, or profane childhood misbehavior? See *Kenny*, 885 F.3d at 290 (noting elementary and secondary school students "are in many ways disorderly or

boisterous by nature"). The Attorney General offers no satisfying answer, nor can we discern one for ourselves. See A.G. Reply Br. 13–14 (asserting "[t]he disorderly conduct statute . . . is clearly intended to punish criminal conduct, not disciplinary infractions"); Oral Arg. 8:55 (contending the statute requires "a criminal level of misbehavior").

The terms "disorderly," "boisterous," "obscene," and "profane" do not explain the law's scope or limit the discretion of those charged with enforcing it. "Disorder" is defined by what it lacks—order.[6] "Boisterous" can simultaneously mean "noisily turbulent," "rowdy," "marked by or expressive of exuberance and high spirits," "stormy," and "tumultuous."[7] "Obscene" and "profane" invite similarly subjective interpretations, with definitions of the former including "abhorrent to morality and virtue" and "containing or being language regarded as taboo in public usage"[8] and the latter encompassing "obscene," "vulgar," and even "irreverent."[9] Based solely on the dictionary definitions of the statutory terms—particularly disorderly and boisterous—it is hard to escape the conclusion that any person passing a schoolyard during recess is likely witnessing a large-scale crime scene.

---

[6] See, *e.g.*, *Disorderly*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/disorderly (last visited Jan. 5, 2023) ("1: engaged in conduct offensive to public order. 2: characterized by disorder").

[7] *Boisterous*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/boisterous (last visited Jan. 5, 2023).

[8] *Obscene*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/obscene (last visited Jan. 5, 2023).

[9] *Profane*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/profane (last visited Jan. 5, 2023).

The Attorney General does not identify any "narrowing state court interpretation" that fixes the problem. *Smith v. Goguen*, 415 U.S. 566, 573 (1974). This Court's decision in *Kenny* already rejected the Attorney General's reliance on *City of Landrum v. Sarratt*, 572 S.E.2d 476 (S.C. Ct. App. 2002). In *Kenny*, the Court explained that while *Sarratt* clarifies that "profane language alone cannot constitute a violation of the [disorderly conduct] law," "it says nothing at all about how to interpret other vague phrases in the [d]isorderly [c]onduct [l]aw like 'conducting [oneself] in a disorderly or boisterous manner' or even what conduct must accompany profane language for there to be a criminal conviction." 885 F.3d at 290.

The South Carolina Supreme Court's decision in *State v. Perkins*, 412 S.E.2d 385 (1991), likewise does not cure the vagueness problems in the disorderly conduct law. In *Perkins*, the court reversed a conviction for conduct that did not occur at school where the record showed only that the defendants "became upset and raised their voices" while visiting a sheriff's office. *Id.* at 385. The court determined that to save the disorderly conduct law from being unconstitutionally overbroad, the law may not reach "spoken words addressed to a police officer" unless the expression meets the constitutional test for "fighting words." *Id.* That decision, however, did not purport to construe—much less narrow—the vague terms of the disorderly conduct law or explain what additional conduct can violate it.

Unless South Carolina intended to criminalize many childish shenanigans (a position the Attorney General does not advance), the vagueness that dooms the disorderly conduct law is not "uncertainty about the normal meaning" of the law's terms but what acts

of adolescent mischief are "covered by the [law] and what [are] not." *City of Chicago v. Morales*, 527 U.S. 41, 57 (1999). Lacking any meaningful standards, the record confirms that officers deploy a glorified smell test to determine whether a student's disorder is disorderly enough to be criminal. For example, one police officer testified arrest may be appropriate if "someone is causing such a disturbance that it would cause me to look over and see what's going on," but not if "someone [is] having a loud discussion with someone." JA 344.

When asked about this issue at oral argument, the Attorney General stated that law enforcement officers must conduct a "totality of the circumstances" analysis to decide whether the disorderly conduct law is violated. Oral Arg. 12:46–13:04. It is true that law enforcement officials routinely consider the totality of the circumstances in assessing whether a person in fact did something that violates the law such as stealing, selling drugs, or the like. But we are unaware of any crime—nor could the Attorney General cite one— requiring a multifactored balancing test to determine *whether a thing a person undisputedly did* is unlawful in the first place. Oral Arg. 13:04–13:31; see *United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.").

The risk of arbitrary enforcement is emphasized and exacerbated by schools' codes of conduct, many of which similarly prohibit "disorderly conduct" or "obscene or profane language" but punish such misbehavior with detention or verbal reprimands. See, *e.g.*, JA 635. As a result, a student's profanity-laced tirade during lunch is likely to

violate both the disorderly conduct law and the school's internal code of conduct, but whether that student is scolded or arrested turns on the whims of a school resource officer. Unsurprisingly, this unbridled discretion generates starkly disparate outcomes. Indeed, evidence submitted to the district court shows that between 2015 and 2020, Black youth were charged with disorderly conduct for incidents in schools at roughly *seven times* the rate of their white peers. The Constitution prohibits this type of inequitable, freewheeling approach.[10]

2.

The Attorney General insists the disorderly conduct law is valid because several incident reports "demonstrate[] criminal conduct" or "show fighting words." A.G. Reply Br. 1, 16. Relatedly, the Attorney General argues that S.P.'s challenge is foreclosed because the behavior for which she was adjudicated delinquent was plainly covered by the disorderly conduct law. Those arguments founder twice on the law and once on the facts.

First, as noted previously, the Supreme Court recently rejected (twice!) "the theory that a vague provision is constitutional merely because there is some conduct that clearly

---

[10] Although the Attorney General complains about the district court's consideration of this statistic, he does not explain why it was improper for the court to do so. That this sort of evidence might also be relevant had plaintiffs brought an equal protection challenge does not mean it lacks value to confirm that the disorderly conduct law fails to give sufficient guidance to prevent discriminatory enforcement. Indeed, this Court has rejected vagueness challenges where plaintiffs failed to provide evidentiary support that a law encouraged discriminatory enforcement. See, *e.g.*, *Hardwick v. Heyward*, 711 F.3d 426, 444 (4th Cir. 2013).

falls within the provision's grasp." *Johnson*, 576 U.S. at 602; see *Dimaya*, 138 S. Ct. at 1214 n.3.

Second, the Attorney General fails to distinguish between the two forms of relief plaintiffs are seeking against the disorderly conduct law. True enough, we recently clarified that a person defending against a current charge may not raise a vagueness *defense* if their own behavior was unambiguously proscribed by the relevant law. See *United States v. Hasson*, 26 F.4th 610, 618–22 (4th Cir. 2022). But that problem, if it exists, relates only to S.P.'s request to enjoin further use of the record of her past referral under the disorderly conduct law. It has nothing to do with S.P.'s and D.D.'s separate request for injunctive relief against the disorderly conduct law's *future* enforcement—which stems from the "credible threat of prosecution" for conduct that "is inevitable on school grounds" and the "chilling effect on their free expression" that threat creates. *Kenny*, 885 F.3d at 288, 289 n.3, 291 (quotation marks omitted).[11]

Finally, the facts of S.P.'s previous referral for violating the disorderly conduct law do not foreclose her request to enjoin further use of the existing record. In 2015, S.P. was a high school freshman dealing with a bully. After a difficult morning when she was derided as fat, ugly, and manly, S.P. orally confronted her classmate before joining her friends at a nearby table in the library. A librarian who witnessed the incident called the principal, who in turn called the student resource officer after S.P. refused to leave. As the

---

[11] The Attorney General's argument about the facts of S.P.'s individual case also has nothing to do with D.D.'s request to enjoin further use of the record of his past referral under the disturbing schools law.

student resource officer was escorting S.P. out of the library, S.P. said "fuck you" to her bully. JA 379. After several students started clapping and mocking her, S.P. stated "fuck all of you." *Id.* S.P. was charged with violating the disorderly conduct law. The solicitor presenting the charge to family court said S.P. violated the disorderly conduct law because she "was loud and used profanity when the administrator and school resource officer were trying to talk with her." JA 386.

Although we agree S.P. misbehaved, we do not agree her misbehavior unambiguously fell within the bounds of a criminal disorder law. See *Morales*, 527 U.S. at 57 (loitering ordinance unconstitutional because it failed to clarify "what loitering is covered by the ordinance and what is not"). S.P.'s outburst falls within the realm of "abusive language between or among students, to include profane language" or "disruptive acts which interfere with the educational process," which would expose her to consequences under a school's disciplinary code. JA 635. But we cannot conclude S.P.'s conduct unambiguously fell within the criminal disorderly conduct law's grasp given that, on a different day, a different school resource officer might well have concluded that her misconduct justified only detention rather than prosecution. See *Morales*, 527 U.S. at 71 (Breyer, J., concurring) ("[I]f every application of [an] ordinance represents an exercise of unlimited discretion, then the ordinance is invalid in all its applications.").[12]

---

[12] Any contention that S.P.'s conduct was clearly proscribed by the disorderly conduct law is even weaker because her charge arose solely from spoken words. We are skeptical that S.P.'s statements "fuck you" and "fuck all of you" were fighting words under modern First Amendment doctrine. See *United States v. Bartow*, 997 F.3d 203, 211 (4th Cir. 2021) (noting that the Supreme Court "has so narrowed the 'fighting words' exception

The disorderly conduct law fails to give South Carolina's schoolchildren fair warning about what it prohibits and vests practically unfettered discretion in those charged with its enforcement. We thus agree with the district court that the portions of that law prohibiting disorderly, boisterous, obscene, or profane language within earshot of a school are unconstitutionally vague as applied to elementary and secondary school students.

## C.

We likewise agree with the district court that the disturbing schools law cannot withstand constitutional scrutiny. During the relevant time, that law made it a crime to "wilfully or unnecessarily" "interfere with or to disturb in any way or in any place the students or teachers of any school or college in this State," "to loiter about such school or college premises," or "to act in an obnoxious manner thereon." S.C. Code Ann. § 16-17-420(A)(1)(a)–(c); see note 2, *supra*.

It is hard to know where to begin with the vagueness problems with this statute. We need not consult the dictionary to conclude that if South Carolina prosecuted all unnecessary disturbances, loitering, or obnoxiousness in schools, judicial dockets would be overrun by preteens. Even more than with the disorderly conduct law, the vagueness

---

that it has not upheld a criminal conviction under the doctrine since *Chaplinsky* [*v. New Hampshire*, 315 U.S. 568 (1942)] itself."). Our doubts are only enhanced because S.P.'s profanity was prompted by the intervention of the school resource officer, who is "expected to exercise a higher degree of restraint than the average citizen and should be less likely to be provoked into misbehavior by such speech." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003).

problem with the disturbing schools law stems from its utter failure to describe the specific conduct covered by the statute.

The disturbing schools law's application to conduct that is "willful[] *or* unnecessar[y]" makes the problem worse, not better. Although "a scienter requirement may mitigate a law's vagueness," *Hoffman Estates*, 455 U.S. at 499, this statute speaks in the disjunctive. As a result, prosecutors need never show willfulness (or purpose, knowledge, intent, or any other culpable state of mind) so long as they can prove the offending conduct was done "unnecessarily"—a word steeped in its own vagueness problems. See *Unnecessarily*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dict ionary/unnecessarily (last visited Jan. 5, 2023) ("not by necessity: to an unnecessary degree").

Nor have South Carolina's courts provided a limiting construction. As this Court explained in its previous opinion, the primary decision on which the Attorney General relies involved an overbreadth challenge and did not "consider the separate question of whether the [disturbing schools law's] prohibitions are unconstitutionally vague and allow for arbitrary and discriminatory enforcement." *Kenny*, 885 F.3d at 291 (discussing *In re Amir X.S.*, 639 S.E.2d 144 (S.C. 2006)). *Kenny* likewise explained why the disturbing schools law compares unfavorably to the regulations at issue in the primary cases discussed in *Amir X.S.*—specifically, *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), and *Grayned v. City of Rockford*, 408 U.S. 104 (1972). See *Kenny*, 885 F.3d at 290–91. Indeed, the ordinance in *Grayned*, the constitutionality of which was a "close" question, included a scienter standard and express temporal and spatial

restrictions. 408 U.S. at 107, 109. The disturbing schools law lacks any analogous clarifying features. Thus, its constitutionality is not nearly so close a question.

The Supreme Court has "struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Williams*, 553 U.S. at 306. We do the same here.

IV.

We turn to the remedy. The Attorney General challenges the final portion of the district court's order, which "permanently enjoin[s]" the relevant government officials "from retaining the records" of members of either subclass "relating to being taken into custody, charges filed, adjudication, or disposition under" either the disorderly conduct or disturbing schools law "except as would be permissible following expungement under S.C. Code Ann. § 17-1-40." JA 947.

For a final time, we are unpersuaded. Despite questioning the district court's "authority" to order this sort of "class-wide expungement," A.G. Br. 52, the Attorney General cites no controlling precedent from the Supreme Court or this Court for his objection and even the non-precedential authorities the Attorney General cites acknowledge expungement is sometimes warranted. The Supreme Court has affirmed class-wide expungement relief where records were obtained in violation of the Constitution, see *Goss v. Lopez*, 419 U.S. 565, 572 (1975), and courts throughout the nation have followed its lead, see Carolina Youth Br. 66 (collecting cases).

The district court committed no abuse of discretion here—not just because the challenged laws are facially invalid as applied to elementary and secondary school students but also because the subclasses demonstrated ongoing injury by the retention of existing records. A delinquency adjudication under South Carolina law may impair a minor's future practice of law, application for military service, use of a driver's license, and educational opportunities.[13] Having concluded the laws may not be constitutionally enforced against South Carolina's elementary and secondary students, we see no reason for allowing such continuing injuries to stand.

The Attorney General insists that if minors desire expungement, they should petition to have their juvenile records expunged using the processes outlined in South Carolina Code § 63-19-2050. That misses the point. The subclasses' entitlement to expungement does not depend on whether they individually satisfy the eligibility criteria outlined in South Carolina's expungement statute, which is meant to deal with people convicted under valid laws. Rather, the subclass members are uniformly entitled to relief because the laws could not authorize or legitimize any elementary school student's arrest, charge, or delinquency adjudication in the first place. See *Welch v. United States*, 578 U.S. 120, 130, 135 (2016). Plaintiffs do not seek vacatur of earlier enforcement actions, but relief from

---

[13] See Application for Admission—Part B, Supreme Court of South Carolina Office of Bar Admissions, https://barapplication.sccourts.org/Documents/SamplePartB.pdf (last visited Jan. 5, 2023) (disclosure of juvenile offenses); Army Reg. 601-210, ¶ 2-11(a) (interview on any records of juvenile court adjudications); S.C. Code Ann. § 63-19-1420(B) (driver's license suspension); S.C. Code Ann. § 59-63-210(A) (grounds for student expulsion).

forward-looking use of records generated from the enforcement of impermissibly vague laws. The district court acted within its discretion in determining such relief was warranted to prevent additional harm from already completed constitutional violations.[14]

*   *   *

Lest there be any confusion: We do not hold that schools are powerless to discipline elementary and secondary school students who disturb the learning environment. Consistent with *Tinker* and the decisions following it, South Carolina educators possess "comprehensive authority . . . consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." 393 U.S. at 507. As part of that authority, schools may adopt and enforce codes of conduct, many of which appear to cover much of the behavior punished under the disorderly conduct and disturbing schools laws.

But unlike the policy in *Tinker* or the codes of conduct maintained in schools throughout the country, the laws challenged here expose minors to criminal prosecution

---

[14] We flag several arguments relating to expungement the Attorney General has not made to this Court. The Attorney General has not claimed the district court erred in certifying the subclasses on the theory that they sought "different injunction[s]" or "individualized" relief that is not permissible under Federal Rule of Civil Procedure 23(b)(2). See *Wal-Mart*, 564 U.S. at 360–61 (quotation marks omitted). (At any rate, the district court entered two class-wide injunctions related to existing records and plaintiffs have stated without contradiction that the district court's remedial order does not require the destruction of any records but merely restricts future use of such records. Oral Arg. 31:59–32:08.) In addition, at no point during his opening brief, his reply brief, or at oral argument has the Attorney General argued that any portion of the district court's remedial order violates the rules of *Younger v. Harris*, 401 U.S. 37 (1971), *Heck v. Humphrey*, 512 U.S. 477 (1994), or their progeny. Accordingly, any such arguments—none of which implicates subject-matter jurisdiction—are now forfeited. See, *e.g.*, *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 308 (4th Cir. 2003).

and all the collateral consequences that follow. Laws imposing such weighty costs on free expression must define their bounds, so students have fair warning about what is prohibited and the discretion of those who enforce the laws is adequately constrained. Because the laws before us fail to do so, the judgment of the district court is

*AFFIRMED*.

NIEMEYER, Circuit Judge, dissenting:

Three South Carolina school students who engaged in disruptive behavior while in school were charged with violating either of two South Carolina misdemeanor statutes — South Carolina Code § 16-17-530 (the Disorderly Conduct Statute) and § 16-17-420 (2010) (the Disturbing Schools Statute). They commenced this action on behalf of themselves and a class of persons similarly situated, contending that the statutes are unconstitutionally vague. They sought declaratory and injunctive relief, as well as an expungement remedy that would prohibit the State from considering or retaining their criminal records relating to the charges.

The district court agreed with the plaintiffs, granting them, as well as a class of all elementary and secondary school students in South Carolina, a permanent injunction prohibiting the enforcement of the Disorderly Conduct Statute against elementary and secondary students in South Carolina while attending school. It also certified two subclasses of students who had been referred or charged under either statute and ordered the expungement remedy for both subclasses. The majority opinion affirms.

Respectfully, I would reverse. In particular, I would conclude that no named plaintiff has standing with respect to either statute to pursue the expungement remedy. This is because the availability of this relief turns on how the statutes were previously applied. And because the laws were not vague *as applied* to those plaintiffs, they lack standing to bring a *facial* vagueness challenge. Further, while I acknowledge that the plaintiffs have standing to seek injunctive relief with respect to the prospective enforcement of the

Disorderly Conduct Statute, I would uphold the constitutionality of that statute on the merits.

In my view, the majority opinion blurs its analysis of the two statutes and who has standing with respect to each form of requested relief.  And in doing so, it dismisses the importance of any distinction between facial challenges and as-applied challenges, describing the "quarrel" about the two as "much ado about little."  *Ante* at 17.  In contrast, I believe that each statute and form of relief must be analyzed separately, as the circumstances of each are meaningfully distinct for purposes of applying the appropriate analysis and disposing of the plaintiffs' claims.

I

The plaintiffs, D.S., D.D, and S.P., were South Carolina students who were charged with disruptive conduct under the South Carolina statutes.  Their individual circumstances are important, especially with respect to an as-applied analysis.

In April 2016, D.S., a 17-year-old female student at Stall High School, engaged in a physical fight in the hallway of her school.  While she did not initiate the fight, she fully engaged in it, and the fight had to be broken up by teachers at the school.  D.S. was sent home from school and later charged with violating the Disturbing Schools Statute.

In April 2017, D.D., an eighth-grade male student at Whittemore Park Middle School, was confronted by school officials with information received from another student, who wrote on social media that D.D. "was going to shoot up a school."  Multiple students claimed that D.D. talked about shooting up a school the previous day when he was riding

the school bus. While D.D. denied the allegations, the school nonetheless called law enforcement to patrol the school grounds in response to the threat, and D.D. was charged with violating the Disturbing Schools Statute. Although that charge was ultimately dismissed, D.D. was still required to transfer to another school.

Finally, in October 2015, S.P., a female freshman at Travelers Rest High School, had an altercation with a classmate in the school library and then refused directives to leave the library while speaking profanity. A classmate had been making fun of S.P. throughout the morning, and S.P. loudly told her to "stop talking about" her. After the library summoned the school principal and the principal told S.P. that she needed to leave the library with him, S.P. refused. The principal then called a school resource officer to the library, who also directed S.P. to leave the library to speak with him and the principal, and again S.P. refused. Finally, when S.P. did decide to leave, she announced that she would "rather be home than in this hell" and said to the classmate, "Fuck you." Students in the library began clapping as S.P. was leaving the library, and S.P. said to her classmates, "Fuck all of you." S.P. was suspended from school for four days and later charged with violating the Disorderly Conduct Statute.

## II. The Disorderly Conduct Statute

The plaintiffs challenged the Disorderly Conduct Statute as unconstitutionally vague "as applied to elementary and secondary school students." That law provides in relevant part:

> A person who . . . conducts himself in a disorderly or boisterous manner [or]
> uses obscene or profane language . . . at any public place or gathering or in
> hearing distance of any schoolhouse or church . . . is guilty of a misdemeanor.

S.C. Code Ann. § 16-17-530(A). The standard for finding a statute unconstitutionally vague is well established. A statute violates the Due Process Clause if it is so vague that it fails to "give a person of ordinary intelligence adequate notice of what conduct is prohibited" or lacks "sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc). It is also well established that one whose conduct is clearly prohibited by a statute cannot challenge the statute for vagueness. *See United States v. Hosford*, 843 F.3d 161, 170 (4th Cir. 2016); *United States v. Hasson*, 26 F.4th 610, 616–17 (4th Cir. 2022). This is because one who has not been affected by vagueness in a statute generally lacks standing to bring a facial challenge on behalf of others who may have been affected. *See Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821, 833 (4th Cir. 1979); *see also Ali v. Hogan*, 26 F.4th 587, 599 (4th Cir. 2022).

To begin, we have already found that S.P. and D.S. have standing to seek an injunction against the enforcement of the Disorderly Conduct Statute in schools based on a credible threat of *future* enforcement of the law and a potential chilling effect on student conduct. *See Kenny v. Wilson*, 885 F.3d 280, 288–89 (4th Cir. 2018). But in *Kenny*, we also acknowledged the requirement that "[a]t least one plaintiff must demonstrate standing for each claim and *form of requested relief*." *Id.* at 287 (emphasis added); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). While we held in *Kenny* that the alleged threat of future enforcement supported standing for the

request for injunctive relief, such a threat does not support standing with respect to the expungement remedy, which is based on *past* conduct. The plaintiffs are seeking expungement relief on behalf of a subclass of all elementary and secondary school students with existing records under the Disorderly Conduct Statute. But because S.P. is the only named plaintiff who has a record of a past referral or charge under the Disorderly Conduct Statute, we must determine whether that law was vague *as applied* to her when determining whether she can pursue the expungement remedy. *See Hosford*, 843 F.3d at 170. I conclude that that cannot be shown.

S.P. created a protracted disturbance in the school library by refusing to comply with directives from the school principal and a school resource officer, and the severity of the disturbance was reflected in the fact that the students in the library clapped as S.P. was leaving it, demonstrating that the disturbance had disrupted the entire library session. Further, during the disturbance, S.P. used profanity in its boldest sense, acting in a "disorderly or boisterous manner." I would thus conclude that S.P.'s conduct fell squarely within the scope of the Disorderly Conduct Statute, and the law was not impermissibly vague as to her. The Statute made it a misdemeanor to conduct oneself "in a disorderly or boisterous manner" or to use "obscene or profane language" while in a public place such as a school. S.C. Code Ann. § 16-17-530(A)(1)–(2). Accordingly, S.P. does not have standing to seek the expungement remedy on the ground that the Disorderly Conduct Statute is facially vague.

With respect to the injunction remedy sought against *future* enforcement of the Statute against elementary and secondary school students — which we earlier held S.P.

and D.S. have standing to pursue — I would conclude on the merits that the Disorderly

Conduct Statute is not unconstitutionally vague.  Courts have consistently upheld similar

laws prohibiting disorderly conduct in public places.  *See, e.g.*, *Grayned v. City of

Rockford*, 408 U.S. 104, 110–11 (1972) (rejecting a facial vagueness challenge to an anti-

noise ordinance that forbade deliberately noisy activity "that disrupts or is about to disrupt

normal school activities" and was limited to when school was in session); *United States v.

Moriello*, 980 F.3d 924, 928, 931–32 (4th Cir. 2020) (rejecting an as-applied vagueness

challenge to a regulation prohibiting "disorderly conduct" or other conduct on federal

property that "impedes or disrupts the performance of official duties by Government

employees"); *United States v. Fentress*, 241 F. Supp. 2d 526, 529–30 (D. Md. 2003)

(rejecting a facial vagueness challenge to a regulation prohibiting "[d]isorderly conduct

which creates loud, boisterous, and unusual noise" or otherwise "tends to impede or prevent

the normal operation" of a Veterans Affairs facility); *cf. Tinker v. Des Moines Indep. Sch.

Dist.*, 393 U.S. 503, 508–09 (1969) (striking down a regulation of student conduct that was

akin to pure speech without any evidence that the conduct would substantially *disrupt or

interfere with school activities*).

Moreover, in this case, the Statute stands on even firmer ground when we apply it

in light of the limiting constructions given to it by South Carolina courts.  Specifically, in

*City of Landrum v. Sarratt*, the South Carolina Court of Appeals concluded that profane

language alone does not violate the Disorderly Conduct Statute in light of the First

Amendment and therefore the Statute must instead be read to prohibit "fighting words" —

words spoken loudly or repeatedly in the presence of others accompanied by aggressive

behavior.  572 S.E.2d 476, 477–79 (S.C. Ct. App. 2002).  The court observed that fighting words incite violence and thus are not protected by the First Amendment.  *Id.* at 478.  While the *Sarratt* holding may not be fully dispositive of the vagueness question, *see Kenny*, 885 F.3d at 290, it nonetheless does narrow the scope of the Statute's text.  And when evaluating a state statute, the federal courts must take the statute precisely as state courts have interpreted it.  *See Kolender v. Lawson*, 461 U.S. 352, 355 n.4 (1983).

Recognizing the principle that "every statute is presumed to be constitutional," *United States v. Bollinger*, 798 F.3d 201, 207 (4th Cir. 2015) (cleaned up), I conclude that the Disorderly Conduct Statute is not unconstitutionally vague.  Indeed, disorderly conduct statutes have been enforced for hundreds of years without substantial difficulty.

### III.  The Disturbing Schools Statute

The plaintiffs also challenge the 2010 version of the Disturbing Schools Statute as unconstitutionally vague *on its face*.  That statute made it "unlawful . . . for any person wilfully or unnecessarily . . . to interfere with or to disturb in any way or in any place the students or teachers of any school or college in [South Carolina] . . . or . . . to act in an obnoxious manner [on school or college premises]."  S.C. Code Ann. § 16-17-420(A) (2010).  Because the Statute was amended in 2018, the plaintiffs no longer seek injunctive relief as to its enforcement and instead seek only the expungement remedy, which requires an *as-applied* analysis.

In *Kenny*, we held that D.S. and S.P. had standing to seek injunctive relief with respect to *the future enforcement* of the Disturbing Schools Statute.  885 F.3d at 289.  But

we did not decide — indeed we left open — who, if anyone, had standing to seek the expungement remedy. *See id*. at 287 n.2. Moreover, we observed that the request for expungement relief might present a standing challenge for the plaintiffs "because one plaintiff does not have standing to request that another plaintiff's records be expunged." *Id.*

In this case, both D.S. and D.D. were charged under the Disturbing Schools Statute and seek the expungement remedy. But to obtain such relief, they must demonstrate the vagueness of the Statute with respect to its *past* enforcement against them, which is an *as-applied* challenge. And it is well established that if an individual's past conduct was clearly prohibited by a statute, the individual cannot challenge it for vagueness. *See Hosford*, 843 F.3d at 170; *Hasson*, 26 F.4th at 616–17. In this case, when looking at the alleged conduct of D.S. and D.D. that gave rise to charges under the Statute, there can be little doubt that the conduct was prohibited by the Disturbing Schools Statute.

D.S. got into a physical altercation in the school hallway that required intervention by schoolteachers. A person of ordinary intelligence would undoubtedly understand that engaging in a physical fight with another student on school property during school hours, requiring the intervention of teachers, would qualify as interfering with and disturbing students and teachers. Similarly, a person of ordinary intelligence would understand that D.D. violated the Statute by threatening, within earshot of multiple other students, to "shoot up" the school. Although he disputed the allegations, that is not relevant to the vagueness analysis. The relevant question is whether the *alleged* conduct, if true, would fall squarely within the terms of the Statute. *See Hasson*, 26 F.4th at 615. Because the conduct of both

D.S. and D.D. fell squarely within the terms of the Disturbing Schools Statute, they cannot claim that they are entitled to the expungement remedy because the Statute was unconstitutionally vague. Likewise, they lack standing to challenge it on the ground that it was "vague for other hypothetical defendants." *Hosford*, 843 F.3d at 170.

Accordingly, the district court's expungement remedy as to the Disturbing Schools Statute should be vacated.

Even if a facial challenge of the Statute were properly before us — although it is not — I would conclude nonetheless that the challenged version of the Statute was facially constitutional. As the Supreme Court has recognized, conduct that disturbs the learning environment is a proper target of regulation. *See Grayned*, 408 U.S. at 110–11. Also, when evaluating a facial challenge to a state law, federal courts must "consider any limiting construction that a state court . . . has proffered" in interpreting the law. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982); *see also Manning*, 930 F.3d at 274.

In *In re Amir X.S.*, the Supreme Court of South Carolina rejected an overbreadth challenge to the Disturbing Schools Statute. 639 S.E.2d 144 (S.C. 2006). The court found that the Statute does not prohibit the "clearly expressive conduct historically subject to overbreadth adjudication in the school context" but is more appropriately understood as a statute "targeting conduct termed 'disruptive' to schools," similar to the anti-noise ordinance at issue in *Grayned*. *Id.* at 147. Although the court in *In re Amir X.S.* dealt with overbreadth, whereas the Statute is challenged before us for vagueness, the state-court opinion nonetheless imposes limitations on the Statute's text that we cannot ignore. As to

those limitations, the court stated: "First, the statute specifically deals with the disturbance of students and teachers in South Carolina's schools, and not a disturbance in just any public forum. Furthermore, it does not explicitly prohibit any type of gathering or expression except those which disturb the learning environment in South Carolina's schools." *Id*. at 149 (citation omitted).

In addition, the court in *In re Amir X.S.* noted that the Disturbing Schools Statute only prohibited conduct that was done "wilfully" or "unnecessarily." 639 S.E.2d at 149 (quoting S.C. Code Ann § 16-17-420(1)(a) (1972)). The Supreme Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Estates*, 455 U.S. at 499. The majority, however, mechanically dismisses the "unnecessarily" language in the Statute as one that does not require a *mens rea*. I respectfully disagree. "Wilfulness," of course, is a well-recognized scienter requirement. *See Bryan v. United States*, 524 U.S. 184, 191 (1998) (explaining that in the criminal context, "wilfully" refers to a culpable state of mind, in which the defendant acted with a bad purpose). And "unnecessarily," as it is positioned in the alternative to "wilfully," is clearly meant to designate a similar *mens rea*, although a less traditional one. "Unnecessarily" requires that the conduct have been done gratuitously —that is, without justification or permissible purpose. *See Gratuitous*, *Black's Law Dictionary* (11th ed. 2019) ("2. Done unnecessarily"). As so understood, the Statute unproblematically prohibits disruptive activity that has no independent justification, that is undertaken voluntarily, and that is of a nature that is highly likely to interfere with the proper

functioning of an educational institution. On that natural understanding of the Statute's scope of application, I cannot see how it could be said to lack a *mens rea*.

At bottom, the Disturbing Schools Statute surely "give[s] a person of ordinary intelligence adequate notice of what conduct is prohibited" and contains "sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning*, 930 F.3d at 272. Therefore, if a facial challenge to the pre-2018 version of the Statute were properly before us, I would uphold it as a constitutional restraint on conduct that disturbs the learning environment in schools.

IV

The education of our youth demands safe and orderly schools that are conducive to learning, and students — or indeed others — who disrupt school activities or create disorder in them must therefore be subject to meaningful regulation.

For years, South Carolina has applied its Disorderly Conduct Statute and Disturbing Schools Statute to address disruption in schools, and there is little evidence that school officials, students, and parents have had difficulty in understanding what conduct was prohibited. Flyspecking the Statutes' words now with the purpose of finding ambiguities is not, I respectfully submit, an appropriate judicial approach to reviewing state statutes. Yet, students who clearly violated the statutes and understood that they were doing so now seek to have them invalidated as unconstitutionally vague. We owe the State deference in its efforts to address school disruption problems — especially in this age when schools are under stress — by recognizing the presumption that its statutes are constitutional. I regret that our holding today materially undermines the State's efforts, and needlessly so.